UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 19mj 2798-AED

UNITED STATES OF AMERICA

vs.

ORLANDO DILLON,
ALISIA LUCKEY, and
RENISHA SMITH,

      Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?
 ___Yes  X  No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?
 ___Yes  X  No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____
MARTY FULGUEIRA ELFENBEIN
Assistant United States Attorney
Florida Bar No. 0020891
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9112
Marta.Elfenbein@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>ORLANDO DILLON,<br>ALISIA LUCKEY, and<br>RENISHA SMITH,<br>*Defendant(s)* | )<br>)<br>)  Case No.  19 mj 2798<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 18, 2019__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952(a), 960(b)(2)(B), and 963 | Conspiracy to import a controlled substance, that is 500 grams or more of cocaine |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Osten J. Berry, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __05/20/2019__

_____
*Judge's signature*

City and state: __Miami, Florida__    LISETTE M. REID, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Osten Berry, a Special Agent with Homeland Security Investigations (hereinafter "HSI"), being duly sworn, depose and state:

1. I have been a Special Agent with HSI since March of 2013. I am currently assigned to ICE/HSI at Port Miami and have served in this position since March of 2018. As a Special Agent with HSI, I am responsible for investigating narcotics entering the United States, and investigating violations of statutes relating to immigration and customs enforcement, including Title 21 of the United States Code.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, 19 and 21 of the United States Code. I have participated in investigations involving violations of the Controlled Substances Act, which include conducting physical and electronic surveillance, execution of search warrants, and arrests of numerous drug traffickers.

3. I have received specialized training in conducting narcotics investigations, including studying the techniques used by smugglers to bring narcotics into the United States. As a law enforcement officer, I have become familiar with the investigation and enforcement of state and federal narcotics laws. Based upon this experience, I have become well versed in the methodology utilized in narcotics trafficking operations, the specific language used by narcotics trafficking operations, and the unique trafficking patterns employed by narcotics organizations. I am also familiar with the various methods generally utilized by traffickers to transport narcotics into the United States from other countries. I have conducted physical and electronic surveillance

in many types of cases, including drug cases. I have arrested numerous individuals for various narcotics violations and have spoken with several narcotics dealers and confidential sources concerning the methods and practices of drug traffickers.

4. The information contained in this Affidavit is submitted for the sole purpose of establishing probable cause for the arrests of Alisia LUCKEY ("LUCKEY"), Renisha SMITH ("SMITH"), and Orlando DILLON ("O. DILLON"), for a violation of Title 21, United States Code, Sections 952(a), 960(b)(2)(b), and 963, that is having knowingly and willfully conspired to import a controlled substance, consisting of 500 grams or more of cocaine.

5. As this Affidavit is submitted for the limited purpose of establishing probable cause, it does not contain all of the information known to me and other law enforcement officers involved in this investigation. The facts and information contained in this Affidavit are based on my personal knowledge and observations, as well as upon information received in my official capacity from other individuals, including other law enforcement officers involved in this investigation as well as my review of records, documents, and other physical items obtained during the course of this investigation.

## PROBABLE CAUSE

6. On May 18, 2019, Customs and Border Protection (CBP) officers boarded the Carnival Horizon (Horizon) cruise ship to conduct routine cabin searches in the Port of Miami. The vessel arrived from several international ports including Cozumel, Mexico; George Town, Cayman Islands; and Ocho Rios, Jamaica. Prior analysis of passengers aboard the Horizon revealed that two females, LUCKEY and SMITH, who appeared to be unrelated, were traveling

2

together and sharing a cabin. LUCKEY and SMITH did not make reservations for the cruise scheduled to depart on May 12, 2019 until May 1, 2019.

7. At approximately 7:00 a.m., CBP officers, escorted by a Carnival security officer, knocked on cabin door 1466, which LUCKEY and SMITH occupied. After several unsuccessful attempts at knocking, the Carnival security officer opened the cabin door. CBP officers encountered three individuals asleep in the cabin. The officers identified themselves as CBP officers conducting routine customs exams. The officers waited outside the cabin door with the door slightly ajar while the three subjects gathered their forms of identification and exited the cabin. The officers identified LUCKEY, SMITH, and a male passenger. The male passenger stated that he was staying in another cabin and visiting LUCKEY and SMITH. A CBP Canine (K9) officer asked all three passengers if everything in the cabin belonged to them and whether the cabin contained any merchandise or items they needed to declare. All three stated that their belongings were inside the cabin. The male passenger identified a small blue backpack inside the cabin as his. LUCKEY and SMITH stated that the rest of the contents in the cabin belonged to them. The CBP K9 officer entered the cabin to conduct a search utilizing his assigned Human and Narcotics Detection Dog (HNDD), which alerted to the closet inside the cabin. The CBP K9 officer and the HNDD exited the cabin. CBP officers entered the cabin to conduct a cabin search and located two identical black backpacks inside the closet sitting on shelves over the safe. One of the CBP officers asked LUCKEY and SMITH to enter the cabin and identify their backpacks. LUCKEY stated that the backpack on the lower shelf belonged to her and the one on the upper shelf belonged to SMITH. SMITH acknowledged that the top backpack belonged to her. One of the CBP officers instructed both passengers to watch as the officers searched the luggage.

3

LUCKEY's bag contained a couple of t-shirts and three shot glasses, but it had considerable weight. SMITH's bag was empty but also felt heavy. One of the CBP officers cut the lining of one backpacks, revealing a flat, rectangular-shaped package wrapped in black plastic. He showed it to both LUCKEY and SMITH, who stated that they purchased the backpacks from a vendor in Jamaica for $20 USD. The officers handcuffed the three passengers for officer safety and escorted them for a secondary inspection in the security office. After further questioning, the male passenger was released with no further incident.

8. CBP officers later discovered a similar flat, rectangular package concealed in the same manner in the second backpack. At secondary inspection, the two packages were removed from the backpacks. CBP officers conducted a field test of the contents of the backpacks, which yielded positive results for the characteristics of cocaine. In total, the two packages weighed approximately 4.59 kilograms. One package weighed approximately 2.33 kilograms and the other weighed approximately 2.26 kilograms.

9. At approximately 10:25 a.m., law enforcement officers read LUCKEY her *Miranda* rights in the English language from a preprinted form. LUCKEY waived her rights and agreed to make a statement without consulting an attorney. During the post-*Miranda* interview, which was conducted in English, LUCKEY stated that she and SMITH worked together at an adult nightclub located in Orlando. A frequent customer and party promoter, who she referred to as "Otis," asked if she wanted to go on a cruise. LUCKEY stated that she and SMITH met up with "Otis's" brother and wife in Jamaica. LUCKEY said that she and SMITH purchased the backpacks to carry their souvenirs.

4

10. At approximately 11:20 a.m., law enforcement officers read SMITH her *Miranda* rights in the English language from a preprinted form. SMITH waived her rights and agreed to make a statement without consulting an attorney. During the post-*Miranda* interview, which was conducted in English, SMITH stated that a frequent customer, who she referred to as "O" and later identified as O. DILLON, asked if she wanted to go on a cruise. LUCKEY and SMITH were going to meet some people in Jamaica who would show them a good time. "O" told them that they would bring back some shoes and asked their shoe size. SMITH stated that, when they got the backpacks in Jamaica, she called "O" to ask if they were getting backpacks. He told them to use the backpacks to bring back their souvenirs. "O" was supposed to pick them up upon their arrival in Miami. LUCKEY and SMITH expected to be paid $1,000 USD once they arrived. They had already received $1,000 prior to the trip. SMITH stated that "O" drove a silver Lexus and she was supposed to call him once they disembarked from the ship.

11. SMITH then agreed to place Facetime calls, phone calls, and sent multiple messages to "O," which law enforcement monitored. During one of the Facetime calls, SMITH called "O" and explained that she got separated from Lucky and asked "O" where he was located. "O" then told her to disembark and go to the right. While she was Facetiming with "O," SMITH noticed a woman with yellow hair in the background, who was the same woman she met in Jamaica. SMITH and "O" then began exchanging text messages. At approximately 1:00 p.m., "O" instructed SMITH to make contact with a man wearing a pink shirt, who was later identified as B.H., and to give him her phone, which SMITH did.

12. Law enforcement maintained surveillance on "O," along with three other people who appeared to be close associates. Once law enforcement saw SMITH hand the phone to B.H.,

5

officers took O. DILLON, who was later identified as "O," G.D., K.P., and B.H. into custody outside of Terminal D at the Port of Miami.

13.   When encountered, O. DILLON, G.D., and K.P. were in a Mercedes-Benz SUV. After all of the occupants exited the vehicles, law enforcement conducted a search incident to arrest of the vehicle. At that time, the front passenger door was open and the CBP HNDD alerted to the passenger seat area that K.P. occupied. Subsequent inspection of the vehicle resulted in the discovery of $2,000 USD in a small purse belonging to K.P. The $2,000 USD was seized.

14.   At approximately 1:50 p.m., law enforcement officers approached SMITH again, advising her that her *Miranda* rights were still valid and asking if she wanted to continue speaking about the incident. SMITH acknowledged that she understood and agreed to continue speaking with law enforcement. SMITH positively identified O. DILLON as the man she referred to as "O," who made cruise ticket reservations, agreed to pay her $2,000 USD in total and provided her with a phone number to call once she arrived in Jamaica. SMITH also positively identified G.D. and K.P. as the couple that she and LUCKEY met in Jamaica and who provided them with the backpacks that concealed the cocaine. SMITH could not identify B.H. and did not know him.

15.   At approximately 2:13 p.m., law enforcement approached LUCKEY again advising her that her *Miranda* rights were still valid and asked whether she wanted to continue speaking about the incident. LUCKEY acknowledged that she understood and agreed to continue speaking with law enforcement. LUCKEY positively identified O. DILLON as the man she referred to as "Otis." LUCKEY also identified O. DILLON as the person who made her cruise reservations, gave her a large sum of cash and a cruise ticket in an envelope on May 12, 2019, agreed to pay her more money upon her return to the United States, and provided her with a phone number to call in

Jamaica. LUCKEY positively identified G.D. and K.P. as the couple that she and SMITH met in Jamaica and who provided them with the backpacks that concealed the cocaine. LUCKEY could not identify B.H. and did not know him. After further questioning, LUCKEY admitted that O. DILLON agreed to pay her $2,000 USD in total and that she did not purchase the backpack but received it from G.D. and K.P. in Jamaica.

16. O. DILLON invoked his *Miranda* rights.

17. Based on the foregoing facts, I submit that probable cause exists to believe that the defendants did knowingly and willfully conspire to import a controlled substance, in violation of Title 21, United States Code, Sections 952(a), 960(b)(2)(b), and 963.

FURTHER AFFIANT SAYETH NAUGHT.

OSTEN BERRY
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Subscribed and sworn to before
me this the 20th day of May, 2019.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE